IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| | : | No. 17-935 |
| v. | : | |
| | : | CRIMINAL ACTION |
| KENNETH SCHNEIDER | : | No. 10-29 |

## MEMORANDUM

Sánchez, C.J.                                                                                    September 6, 2019

   The origins of this prosecution can be traced to the years-long unsupervised relationship between an American lawyer and Russian boy, plucked from his home by promises of elite ballet training, and their travels between Russia and the United States. The boy claimed the lawyer regularly abused him during their time together, and the lawyer denied it. The jury heard from both and believed the boy, finding the lawyer—Defendant Kenneth Schneider—guilty on both counts of the indictment.[1] His direct appeals exhausted, Schneider is back before this Court seeking an order vacating his conviction and sentence and dismissing the indictment pursuant to 28 U.S.C. § 2255. He claims the process resulting in his conviction was defective in thirteen separate ways, nearly all of which center on his legal team's purported ineffectiveness before this Court and the U.S. Court of Appeals for the Third Circuit. The Court is not persuaded any of these alleged errors warrant the extraordinary relief Schneider seeks. Because the Court finds Schneider's counsel was not constitutionally ineffective and Schneider's rights were not otherwise violated, the Court will deny the Motion in its entirety without an evidentiary hearing and without granting a certificate of appealability.

---

[1] The indictment charged Schneider with one count of traveling for the purpose of engaging in sex with a minor, in violation of 18 U.S.C. § 2423(b) (Count 1), and one count of transporting a person for criminal sexual conduct, in violation of 18 U.S.C. § 2421 (Count 2). *See* Indictment, Jan. 14, 2010, ECF No.3. Ultimately, the Court granted Schneider's motion for judgment of acquittal on Count 2. Order, Sept. 21, 2011, ECF No. 175.

**FACTS[2]**

This case stems from Defendant Kenneth Schneider's sexual abuse of an underage Russian ballet student, the years Schneider and the child shared an apartment in Moscow, Russia, and their travel between the United States and the Russian Federation on August 22, 2001.[3] On January 14, 2010, a grand jury in the Eastern District of Pennsylvania returned a two-count indictment against Schneider, charging him in Count 1 with traveling for the purpose of engaging in sex with a minor, in violation of 18 U.S.C. § 2423(b), and in Count 2 with transporting a person for criminal sexual conduct, in violation of 18 U.S.C. § 2421. *See* Indictment, Jan. 14, 2010, ECF No. 3.

After extensive motion practice,[4] including over the parties' respective abilities to obtain certain evidence and testimony from Russia, this matter proceeded to jury trial on September 20, 2010. The Government's case lasted five days. It called a number of witnesses, including the victim, the victim's parents, the Government agent who investigated Schneider's misconduct, and one of the victim's ballet teachers at the elite Bolshoi Academy (who was partially responsible for

---

[2] The Court decides Schneider's motion without an evidentiary hearing. Such a hearing is required unless "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also United States v. Tolliver*, 800 F.3d 138, 141 (3d Cir. 2015) (noting "where a petitioner alleges any facts warranting relief under § 2255 that are not clearly resolved by the record," the district court must hold an evidentiary hearing). Here, the record conclusively establishes Schneider is not entitled to the relief he seeks, and, thus no evidentiary hearing is required.

[3] The underlying factual allegations have been repeated both by this Court, *see United States v. Schneider*, 817 F. Supp. 2d 586, 590-93 (E.D. Pa. 2011), and the Third Circuit, *see United States v. Schneider*, 801 F.3d 186, 189-91 (3d Cir. 2015). The Court need not repeat them here.

[4] One of the significant issues litigated prior to trial was whether this case should be designated as "complex" within the meaning of the Speedy Trial Act, and therefore continued beyond the Act's 70-day limit. *See* Mot. for Complex Case Designation, June 9, 2010, ECF No. 34; Opp'n to Mot. for Complex Case Designation, June 15, 2010, ECF No. 42. Ultimately, the Court sided with Schneider and denied the continuance, resulting in a period of less than 90 calendar days between the denial of the continuance and his trial. Order, June 25, 2010 ECF No. 53.

introducing the victim to Schneider). The Government also called Schneider's housekeeper and neighbor, who appeared by live video feed from the inside of a Russian government building.

After the Government rested, Schneider moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). The Court denied the motion as to Count I and reserved ruling on as to Count II. Schneider's legal team then put on his own case, which was nearly as extensive as the Government's case-in-chief. He took the stand in his own defense and called a number of additional witnesses, including various members of his family (who were parties to the companion civil litigation between the victim and Schneider, but not named in the criminal case), the victim's civil counsel and therapist, another young Eastern European boy who had traveled extensively with Schneider, and the victim's wife and mother-in-law, who were involved in the victim's decision to come forward. Schneider was unable to call his Russian teacher or the former vice-rector of the Bolshoi Academy, both of whom he claims would have provided exculpatory testimony.

On the ninth day, the jury returned a guilty verdict on both counts of the indictment. Schneider's counsel renewed their motion for judgment of acquittal, which the Court ultimately granted on Count II, but denied on Count I. *See* Order, Sept. 21, 2011, ECF No. 175. A sentencing hearing was conducted on November 30, 2011, and December 1, 2011. The Court imposed a sentence of 180 months' incarceration, three years of supervised release, a special assessment of $100, a fine of $20,000, and restitution of $30,000. *See* J. & Commitment Order, Dec. 13, 2011, ECF No. 212. On January 17, 2012, Schneider appealed the Judgment and Commitment Order. *See* Notice of Appeal, Jan. 17, 2012, ECF No. 220.

While the appeal was pending before the Third Circuit, Schneider sought a new trial based on evidence produced during the civil case, which, purportedly, established the victim perjured

himself during his testimony at Schneider's criminal trial. *See* Mot. for New Trial, Aug. 20, 2012, ECF No. 247. On February 13, 2013, the Court denied the motion, and, again, Schneider appealed. *See* Notice of Appeal, Feb. 21, 2013, ECF No. 263. After hearing argument on both of Schneider's appeals, the Third Circuit affirmed both the Judgment and Commitment Order and the Order denying Schneider's request for a new trial. *See* Judgment, Sept. 9, 2015, ECF No. 295. The Supreme Court subsequently denied certiorari on February 29, 2016. *See Schneider v. United States*, 136 S. Ct. 1217 (2016).

On February 28, 2017, Schneider timely filed the instant Motion to Vacate, Set Aside or Correct a Sentence By a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 (the Motion). The matter is now ripe for a decision.

## DISCUSSION

Pursuant to 28 U.S.C. § 2255, a prisoner in federal custody or may seek to have his sentence vacated, set aside, or corrected if it was imposed in violation of the Constitution or laws of the United States, or is otherwise subject to collateral attack. Here, Schneider claims his sentence was imposed in violation of his Sixth Amendment right to the effective assistance of counsel, and his due process rights under the Fourteenth Amendment. The Court will address the grounds for relief in the order in which they appear in Schneider's motion. In so doing, the Court "must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." *United States v. Tolliver*, 800 F.3d 138, 141 (3d Cir. 2015).

All but two of Schneider's assert claims for violation of his Sixth Amendment right to the effective assistance of counsel, *see* U.S. Const. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."), and so the Court begins by discussing the legal standard applicable to those claims. A criminal defendant establishes a viable claim for violation of his Sixth Amendment right by producing evidence (1)

counsel's performance fell below an objective standard of reasonableness (the "performance" prong) and (2) the deficient performance resulted in prejudice to the defendant (the "prejudice" prong). *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To satisfy the performance prong, a petitioner must show his counsel's conduct fell below an objective standard of reasonableness. *Id.* at 688. When evaluating counsel's performance, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The mere fact that a tactic has been unsuccessful does not necessarily indicate such a tactic was unreasonable, and a court cannot use the benefit of hindsight to second-guess tactical decisions. *Id.* at 690; *see also Diggs v. Owens,* 833 F.2d 439, 444–45 (3d Cir. 1987) ("An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial. Consequently, judicial scrutiny of an attorney's competence is highly deferential."). Indeed, it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *United States v. Gray,* 878 F.2d 702, 711 (3d Cir.1989).

To satisfy the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. This standard requires the petitioner to show more than "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, those errors must be of sufficient magnitude "to undermine confidence in the outcome" of the trial. *Id.* at 694. In ruling on a § 2255 motion, a court may address the prejudice prong first "and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." *Rolan v. Vaughn,* 445 F.3d 671, 678 (3d Cir.2006).

Claim I involves Schneider's counsels' use of an article appearing in the Russian newspaper, *Kommersant*, accusing Schneider of being a homosexual and pedophile, *see* Mot. A.3 ("They assure that one American, Mr. Schneider, who is a pedophile and homosexual, has started playing a big role in the school."), which was later retracted by the newspaper, *see id.* A.5 ("On April 10, 2002[,] . . . groundless and unfair accusations were made against US citizen Kenneth Schneider, who was financially and [in] other way[s] assisting [the Bolshoi Academy].").[5] Schneider argues there was no conceivable trial strategy for which the *Kommersant* article was helpful and, absent its frequent use, the outcome would have been different. He argues further that if the basis for introducing the article was to show Schneider had previously been cleared by Russian authorities, counsel's failure to produce the available evidence of that fact was constitutionally deficient. None of these arguments is persuasive.

Schneider's reliance on a number of out-of-context references is misplaced. Nearly every reference to the article by his counsel was accompanied by reference to the *retraction* of the article, thus curing whatever prejudice may have resulted from reference to the unfounded allegation in isolation. However, the Court need not decide this aspect of the Motion on the prejudice prong alone because the Court is satisfied its repeated reference was in the service of counsel's trial strategy, and thus Schneider's claim also fails on *Strickland*'s performance prong. As the Government points out, it was reasonable for counsel to cite the article and its retraction in order to preempt the Government's reliance on the document, as well as to try to: (1) establish Schneider was being unfairly targeted; (2) demonstrate no one—including the victim, his parents, or other individuals regularly in contact with him—actually believed Schneider was a pedophile at the time

---

[5] Citations to A, followed by a number, refer to pages of the appendix submitted with Schneider's motion.

the article came out; and, (3) garner sympathy for Schneider. As a result, the Court also finds the use of the *Kommersant* article did not fall below an objective standard of reasonableness, and thus Schneider has failed to meet his burden under *Strickland*'s performance prong. Relief will be denied on Claim I.

In Claim II, Schneider asserts his counsel was ineffective because he conceded Schneider's guilt. As evidence, Schneider points to his counsel's argument that the Government failed to show that the dominant purpose of the 2001 return trip to Moscow was sexual, Tr. 1.45, and that under Russian law, the victim was not "materially dependent" on Schneider, Tr.8.106-07. In other words, Schneider claims his counsel was constitutionally ineffective by making arguments in favor of acquittal rather than solely denying any sexual contact between Schneider and the victim ever occurred. Relief is not warranted.

First, Schneider's gloss on counsel's arguments is not supported by the record. At no time—including when arguing that the Government failed to satisfy its burden on other elements of the crimes charged—did counsel ever concede Schneider's guilt. Indeed, counsel, in both his opening and closing arguments, *repeatedly* proclaimed Schneider's innocence and sought to undermine the victim's credibility. *See e.g.,* Tr. 1.30 ("Ken denies it, absolutely, and he will tell you so."); 1.43 ("Ken didn't offer to pay any money [after receiving the victim's civil demand], 'cause he didn't do anything wrong . . . he's endured a horrific two years that you'll hear about, but he's endured it, cause he did nothing wrong."); 8.74 ("And when you first hearing something like this, you must think it's true, who would make this up? Why would anybody make this up? You heard about twenty million reasons why people would make this up."); Tr. 8.95 ("Does it make sense that he's going to call [the Bolshoi medical staff] out like that at a time when he's raping a child across the street? I'd suggest that's unlikely."); Tr. 8.108 ("He didn't pay these

people off. He didn't offer them ten cents and the reason, it's because he didn't do anything and he's counting on justice."). As Schneider concedes, his trial was ultimately a credibility contest between he and the victim, and counsel aggressively sought to undermine the victim's version of events.

Second, the Court also rejects Schneider's argument counsel was ineffective for conceding, during his closing, that characterizing the charges against Schneider as "made up, is maybe, too strong." Mot. 19 (quoting Tr. 8.106). The Court is not persuaded Schneider met his burden on either *Strickland*'s prongs. The Court can envision a number of strategies such a conciliatory gesture might serve, including ingratiating counsel with the jury (something he sought to do repeatedly throughout the trial[6])—especially important where, as was true in this case and Schneider concedes, the case turned on credibility determinations. *See* Tr. 1.30 ("Ken Schneider did not assault [RZ], they say he did; he says he didn't, you'll have to decide, that's what this case is about.").[7] The Court is also not persuaded that the comment caused *Strickland*-level prejudice. As noted above, counsel repeatedly proclaimed Schneider's innocence and attacked the victim's credibility.[8] In light of that strategic decision, counsel's single off-hand comment which only

---

[6] *See*, e.g., Tr. 1.31 ("If you feel like I'm causing – or we're causing – inevitable delays – hold it against me and not against Kenneth, that's the first thing I'd ask.").

[7] To the extent it is necessary to refer to the victim other than as "the victim," the Court uses his initials to protect his identity.

[8] The Court need not reproduce the entire transcript of counsel's opening and closing arguments but nevertheless provides the following additional citations as further examples of the degree to which counsel emphasized Schneider's innocence and the victim's lack of credibility. *See, e.g.*, Tr. 1.40 ("[RZ] seemed to like it [at Schneider's apartment]. He never complained to anybody."); Tr. 1.41 ("[RZ's] parents signed authorizations repeatedly for Ken to take [RZ] to the United States to wherever they went. There was no misunderstanding or mystery about what was occurring and there was never a complaint from [RZ] or from the parents until July 2008."); Tr. 1.46 ("What happened next after they called him in – after [RZ] and his father got called in [to speak to Russian authorities after the *Kommersant* article]? Is that [RZ's] father sent [RZ] with Ken to the United

obliquely touched upon Schneider's claim of innocence could not have "refuted [his] testimony" in a way which might have impacted the outcome of the trial. Mot. 19. As a result, Schneider has also failed to establish prejudice.

Finally, in further support of Claim II, Schneider cites pieces of counsel's cross examination of case agent Emily Arnold. To the extent this aspect of his argument is based on counsel's one-time use of the phrase "any relevant time," the Court is not persuaded relief is justified. As the Government points out, Arnold never answered the question which included this modifier, and the Court instructed in its closing charge that counsels' questions were not evidence—a rule to which defense counsel alluded in his own closing. *See* Tr. 8.120 ("Questions by the lawyers and questions that I might have asked, is not evidence . . . objections by the lawyers including objections in which the lawyer stated facts, is not evidence."); *see also* Tr. 8.74-75 ("But you shouldn't decide the case based on whether you think the demand is reasonable or the conduct

---

States to go to school in Massachusetts in the fall of 2003. Nothing happened, 'cause nothing happened."); Tr. 8.74 ("There's a special place in hell reserved people who assault children and I'm sure we all agree that that's true. But I hope nearby there's a place for people who make false allegations, because the people who do count on the goodness of people like you to believe it, because who would make it up."); Tr. 8.85 ("Does it make any sense that Kenneth Schneider is starting a fight with the medical staff at the academy by going over their head to the Ministry of Health when he's anally raping one of the students three to four times a week? Does that make any sense to you?"); Tr. 8.86 ("The fact that the housekeeper never saw anything – I agree with counsel, she's the most likely to have seen something. The fact that she never did is a circumstance indirectly proving another fact and that's that nothing ever happened."); Tr. 8.98 ("You don't think that if there was any substance to the that accusation, he'd still be in jail in Russia? Palchikov did an investigation according to the witnesses. There was – as Nikolai [Dokukin] said—a conflict between Palchikov and [RZ's] family, it was about whether there was something going on there and, in fact, nothing happened."); Tr. 8.103 ("There's a principle in the law called, *falsus in uno*, *falsus in omnibus* and it comes from the Latin and it means false in one, false in all. . . . [RZ] made false claims against Susan and Bernard and Marjorie and that's what this evidence establishes. Why did he do that? 'Cause he thought it was in his financial interest to do so. What do you conclude about people who are willing to make false statements in litigation paperwork – lawsuits—to get money?").

of the lawyers is appropriate or not, that's not appropriate, I'd suggest. What's appropriate is to look at the evidence in the courtroom . . . And I'd like to invite you to look at the evidence in this case, not the emotions, look at the evidence."). The Court is also persuaded by the Government's argument with respect to *Strickland*'s prejudice prong. Although not all aspects of counsel's cross examination were necessarily helpful—particularly those questions about the limitations on Arnold's investigation, which could reasonably be construed to support the inference other victims might have been out there—on the whole, the Court does not find this single line of questioning, which was part of an extended cross examination, was so damaging as to undermine confidence in the jury's unanimous verdict. For these reasons, the Court will deny Schneider's second claim for relief.

Claim III attacks his counsel's decision to call two witness, a therapist who had attempted to treat the victim, Christina Bates, and the victim's attorney in the parallel civil proceedings, E. William Hevenor. Although the Court questions whether the testimony of these witnesses was helpful to Schneider's defense, it will nevertheless deny relief because counsels' decision to call these witnesses did not fall below an objective standard of reasonableness.

Regarding the decision to call Bates, the victim's therapist, Schneider argues counsel was ineffective because aspects of her testimony corroborated the victim's claimed trauma. Schneider specifically focuses on Bates's testimony that the victim related to her that a "trigger for him was when his wife would approach him from behind, maybe, to come up behind him and hug up to him, that was very bothersome for him." Tr. 6.37. She testified further this "was the only trigger he reported to me that I noted was a direct influence or result of his reported molestation." *Id.* Schneider claims this testimony bolstered the Government's case by corroborating the victim's testimony and was based on "ignorance of the sequelae of trauma." Mot. 26. Schneider also

complains his counsel's decision to call Bates created the opportunity for the Government to cross Bates in a way that confirmed the victim suffered many of the classic signs of trauma—inadequate eye contact, soft voice, flat affect, and a difficult time volunteering information. *See* Mot. 27-28.

The Court will not grant Schneider's request for relief on this claim. On balance, the Court agrees that Bates's testimony was likely more harmful to Schneider than it was helpful.[9] Nevertheless, because counsels' decision to call her in the original instance was reasonable, Schneider's claim fails on *Strickland*'s performance prong. As Schneider states in his Motion, "[p]resumably, counsel called Ms. Bates to establish that [the victim] would not disclose pertinent information about the history of abuse, thereby casting doubt on the accusations of sexual molestation." Mot. 26. A review of the transcript leaves nothing to presume; it is obvious this was counsel's strategy. *See, e.g.*, Tr. 6.35 ("Q. What – if anything – was remarkable about that initial intake appointment? A. I – I remarked that his wife, Gina had answered most of the questions for the client"); *id.* ("Q. Now, over the course of those seven therapy sessions, did you have any difficulty securing information from [RZ]? A. Yes, I did."). Risky as this strategy might appear in hindsight, the trial hinged on the victim's credibility and it was reasonable for Schneider's counsel to attack it by calling the victim's treating therapist to suggest the victim had not been forthright. As a result, the Court will deny this aspect of Schneider's request for relief.

The Court will also deny Schneider's request for relief to the extent it is premised on counsels' decision to call E. William Hevenor, the victim's civil counsel. The primary thrusts of Schneider's argument are that counsel's decision to call Hevenor (who his counsel declined to treat as hostile) prejudiced Schneider by (1) creating the opportunity for Hevenor to express his obvious

---

[9] The Court will again consider the prejudice wrought Bates's testimony in connection with Schneider's claim for relief based on cumulative prejudice (Claim XIII).

contempt for Schneider and (2) questioning Hevenor in a way which undermined the credibility of Schneider's parents, who had testified earlier on his behalf.

The Court will deny relief on this aspect of Schneider's claim because he has not satisfied *Strickland*'s performance prong. Again, as with Bates's testimony, Hevenor's testimony was probably not as helpful to Schneider as his counsel may have hoped. Indeed, the guilty verdict suggests counsel's attempts to use Hevenor's testimony to establish a motivation for the victim to fabricate his claims was unsuccessful. However, counsels' decision to call Hevenor in the service of this strategy—regardless of whether Hevenor was treated as a hostile witness—was reasonable. As has been noted throughout, Schneider's counsel repeatedly framed the matter as a credibility contest between Schneider and his victim. Hevenor's testimony regarding the value of the civil case was clearly germane to Schneider's counsel's attempts to show the victim was motivated by the prospect of a large civil award, and not because Schneider had actually abused him. Similarly, Hevenor's testimony as to his involvement in the victim's mental health treatment, which counsel suggested was for the purpose of finding a more litigation-friendly provider, was also clearly related to counsel's attempts to undermine the victim's credibility. Ultimately, Schneider's complaint is really about Hevenor's lack of cooperation on the stand, and a series of unresponsive outbursts in which Hevenor expressed his clear disdain for Schneider. However, by its very nature, counsel could not have anticipated Hevenor's indecorous conduct (especially for a member of the bar), and thus cannot be found ineffective for calling him on this basis.[10]

Schneider also takes issue with a portion of Hevenor's questioning related to Schneider's parents, Marjorie and Bernard, who had previously testified on their son's behalf. Specifically, he

---

[10] The Court will revisit the issue of prejudice in connection with Hevenor's testimony when it considers Schneider's claim of cumulative prejudice.

claims his counsel's attempts to question Hevenor about his investigation into the merits of the victim's civil case undermined Marjorie and Bernard's testimony. Having reviewed the testimony at issue, it is readily apparent counsel was attempting to probe Hevenor's factual basis for filing the civil claims against Marjorie and Bernard, as well as Schneider's sister, Susan (about whom counsel had questioned Hevenor immediately beforehand). Doing so was reasonable in light of the connection between the civil case against Schneider—in which Marjorie, Bernard, and Susan, were named—and the criminal prosecution. That Hevenor did not provide answers counsel could then use does not mean his questioning was deficient. Even if Schneider's claim succeeded on *Strickland*'s performance prong, the Court would nevertheless decline to grant relief because Schneider has failed to establish that, had counsel not asked these questions, the result of the trial may have been different (i.e., success on the prejudice prong). Despite Schneider's argument to the contrary, no reasonable review of the testimony at issue supports his position that counsel's questioning "provided powerful corroboration of . . . an uncharged conspiracy involving other members of [Schneider's] family." Mot. 29-30. Schneider's request for relief on this basis will, therefore, be denied.

In Claim IV, Schneider alleges counsel's deficiency with respect to the "innocent round trip" exception stated in *Mortensen v. United States*, 332 U.S 369 (1944) and its application to Schneider's charge for violation of 18 U.S.C. § 2423(b). More specifically, Schneider claims counsel was ineffective for failing to (1) object to the "dominant purpose" instruction, which he claims improperly split his trip into two parts, Mot. 35; (2) request an instruction on the innocent round trip exception, which he claims was required to cure the prejudice caused by the "dominant purpose" instruction's improper severing of his trip *id.* 36; and, (3) present "readily available

evidence" in support of the innocent round trip exception, *id.* 38. None of Schneider's allegations warrants relief.

Each of the three sub-grounds Schneider relies upon would require this Court to extend the innocent round trip exception from its traditional confines as an exception to a violation of 18 U.S.C. § 2421 (which the Court applied to dismiss one of Schneider's convictions, post-trial) to a violation of 18 U.S.C. § 2423(b). This is the *third* time Schneider has asked a Court to do so (although the first in this procedural posture), and because it is the third time, the Court need not repeat the exhaustive treatment the issue received both before this Court and the Third Circuit. *See United States v. Schneider*, 817 F. Supp. 2d 586, 599 (E.D. Pa. 2011) (noting "the rationale of *Mortensen* does not apply, and it is not improper to focus only on Schneider's intent in making the trip from Philadelphia to Russia"), *aff'd*, 801 F.3d 186, 195 ("Because the trip was part of Schneider's calculated plan to manipulate and abuse the victim, the *Mortensen* exception is inapplicable."). It suffices to say Schneider's counsels' failure to undertake certain actions based on law that does not apply cannot serve as the basis for a claim for the ineffective assistance of counsel. Claim IV will be denied.

In Claim V, Schneider asserts he is entitled to relief based on counsel's purported failure to object to four different instances of prejudicial testimony. Specifically, he claims his counsel should have objected to (1) the victim's father's insinuation that homosexuality equated to pedophilia; (2) the victim's mother's testimony stating she observed the victim making sexual motions in his sleep; (3) questions suggesting that, because he was not a ballet instructor, Schneider's presence at the Bolshoi Academy must have meant he was a pedophile; and, (4) testimony attempting to show Schneider supplanted the victim's parents' authority. Schneider also

complains his counsel failed to refute testimony that Schneider "related" to the victim "in an inappropriately familiar manner." Mot. 43. None of these grounds warrant relief.

First, Schneider argues he is entitled to relief because his counsel interjected, and failed to intercede in the Government's attempts to interject, the inference that homosexuality equated with pedophilia. The Court is not persuaded. The animus from which the false equivalence between homosexuality and pedophilia stems is obvious—and discrediting—and so counsels' decision to allow the victim's father to express such prejudice, and later confirm it through Tatiana Dokukina, was reasonable.[11] Moreover, as the Government points out, whatever prejudice may have been worked was cured by the Court's instruction to the jury to "decide the facts from the evidence," Tr. 8.118, and the Court's admonishment to the jury that it not to be influenced by "any person's . . . sexual orientation," Tr. 8.119. Schneider's *Strickland* claim on this basis, therefore, fails on both the performance and prejudice prongs.

Second, Schneider claims his counsel was deficient for failing to object to the victim's mother's testimony that she observed the victim making motions of an "obviously . . . sexual character" in his sleep. Tr. 2.134. This claim also fails on both the performance and prejudice prongs. The mother's observations were obviously relevant to whether Schneider was abusing her son, and counsels' decision not to make a meritless objection—which would have drawn more attention to a damaging piece of testimony—was thus reasonable. The Court also disagrees with Schneider's assertion that it would have granted an objection. Under even the most favorable

---

[11] Schneider's attempt to cast the Government's questioning in some nefarious light is at least partially undercut by the prosecutor's closing argument, in which she clearly stated that had Schneider had a significant other *of any gender*, his claim of innocence might be more viable. *See* Tr. 8.61 ("Ask yourselves why would a thirty-four-year-old man about whom you've heard no testimony of a boyfriend, girlfriend, significant other, no testimony that he had children, a single man, allegedly working long hours, why would he want to spend his only free to bring into his home a twelve-year-old, a pre-teen, whom he didn't know?").

circumstances, an objection would likely have resulted in the Court requiring the Government to lay a more thorough foundation for the mother's conclusion, such as by having her describe the precise motions she observed. Avoiding this unquestionably more damaging possibility by refraining from objecting was also reasonable. Moreover, Schneider's claim on *Strickland*'s prejudice prong is undercut by the testimony of the victim's therapist, Christina Bates, who explained the victim had post-traumatic stress disorder which manifested as a fear of being approached from behind. Thus, even had the Court done exactly what Schneider claims it would have done (i.e., grant the objection and bar the mother's testimony), evidence of the victim's response to trauma would have been before the jury.

Schneider also claims relief is warranted because his counsel failed to object to the Government's attempt to establish he was a pedophile by eliciting testimony Schneider (1) was involved with the Bolshoi, notwithstanding his lack of formal ballet training, and (2) had, in the eyes of the victim's mother, supplanted her and her husband's parental authority. As to his involvement with the Bolshoi, Schneider offers no specific objection. At best, this ground for relief is merely a disagreement with the inference the Government asked the jury to make, i.e., he was involved with the Bolshoi to find and groom victims. His disagreement does not entitle him to relief. With respect to the mother's testimony, Schneider is somewhat more specific, positing the testimony was impermissible under Federal Rule of Evidence 701. But the isolated comment upon which Schneider relies is out of context. Considered as part of the larger line of questioning to which it belongs, it is clear the victim's mother's testimony is rationally based on her perception, helpful to understanding her testimony, and not based on any specialized knowledge within the scope of Rule 702. This ground for relief will be denied.

The final aspect of this portion of Schneider's motion faults counsel for failing to rebut the Government's attempt to demonstrate Schneider and the victim conversed in an inappropriate manner by using the Russian language's familiar forms of address. The Court need not address whether Schneider has met *Strickland*'s performance prong because Schneider has not made a compelling case on the prejudice prong. At best, the use of the familiar form was a piece of exceptionally weak circumstantial evidence supporting the Government's case. No reasonable review of the trial transcript supports the conclusion that, had counsel drawn more attention to the issue by presenting the testimony of Schneider's translator, there is a reasonable probability the outcome might have been different. As a result, the Court finds Schneider has failed to establish the prejudice prong of the *Strickland* analysis and will deny relief on this basis.

In Claim VI, Schneider claims he is entitled to relief because the Government violated his due process rights during its cross-examination of SG,[12] a Moldovan boy called as a defense witness.[13] Schneider alleges the Government knowingly prompted SG to lie on cross examination about aspects of Schneider's sponsorship of SG's trip to New Orleans, Louisiana, and thereby violated Schneider's due process rights under *Napue v. Illinois*, 360 U.S 264, 269 (1959). The Government opposes relief on this claim on the grounds SG's testimony was only "arguably" inconsistent with the statements SG, his sister, SaG, and mother, RG, provided during the investigation, and was consistent with a written statement RG provided on the eve of trial (which

---

[12] The Court uses pseudonyms to protect the identities of the G family.

[13] The decision to call SG as a witness is, itself, an alleged basis for relief discussed in greater detail below.

Schneider claims was never produced). The Court will deny relief on the merits because Schneider has produced no evidence to support the serious accusation he levels at the Government.[14]

Because Schneider's claims involve allegations of perjury vis-à-vis SG's testimony concerning Schneider's purported hostility to SaG's presence during the New Orleans trip, including by initially refusing to pay for her tickets, the Court's analysis begins with an in-depth review of the written statements and trial testimony. On July 23, 2009, Special Agents Emily Arnold and Glenn Spindel conducted an interview of SG (then 13 years old), his sister, SaG (then 23 years old), and their mother, RG. *See* Opp'n Ex. A at 3. On August 4, 2009, Special Agent Arnold prepared a Report of Investigation (the Report) summarizing the information provided by the interviewees. *See id.* at 1. Although the Report refers to each of the interviewees, the Report does not consistently identify which statements are attributable to which of the three interviewees. In a portion attributable to RG, SG's mother, RG recounts Schneider as asking whether SG "could attend summer school and perform in a concert in the United States." Opp'n Ex. A at 3. According to the Report, "[RG] stated that she agreed to let [SG] travel to the United States if his sister, [SaG], accompanied him." *Id.* Crucially, the Report explains further:

> Schneider told the [Gs] to purchase the airplane tickets in Moldova, and that he would reimburse them. The [Gs] purchased the tickets for [SG] and [SaG] to travel to New Orleans. Schneider wrote a check to [SG] for the amount of the airplane tickets at some point during their stay in New Orleans.

---

[14] The Government suggests this claim is procedurally barred because Schneider's counsel failed to object at trial or on direct appeal. To that end, they cite *United States v. Frady*, 456 U.S. 152, 167-68, which held that, "to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." Because the Court finds this ground fails on its merits, the Court will not address the default issue.

*Id.* The Report also includes five paragraphs, which appear to reflect statements given by SG. *Id.* at 5-6. Although the statements describe the circumstances of his, his sister's, and Schneider's time in New Orleans (i.e., the things he did while there), they do not reference the crucial issues of who paid for the trip and whether Schneider was at all hostile to SaG's presence. *Id.*

Finally, the Report includes statements which appear to be given by SaG, who, as noted, is SG's older sister and accompanied him on the trip to New Orleans. SaG recounted she first met Schneider after Schneider awarded SG a scholarship. During their correspondence, Schneider offered to arrange a trip to the United States for SG. "When it was planned for [SaG] to attend to supervise [SG]," the Report states, "Schneider stated that it would be easier for [SaG] to obtain a visa if she was listed as a 'Regional Coordinator' of the Apogee Foundation."[15] *Id.* at 7. Of the issue of payment, SaG recounted,

> When Schneider reimbursed [SG] with a check for the costs of the airline tickets to the United States, the [Gs] had a large amount of trouble cashing the check. Finally, family friends in Atlanta that the [Gs] visited before returning to Maldova helped them cash the check.

*Id.*

Three days before the beginning of the trial in this matter, on September 17, 2010, RG gave a second statement to Special Agent Michael C. Ruibal. *See* Opp'n Ex. B at 1. The individuals present for this interview were RG, Special Agent Ruibal, Assistant United States Attorney Michelle Morgan, and a translator, Lee Roth. *Id.* In this statement, RG stated:

> Kenneth Schneider initially suggested [SG] travel alone with Schneider on a trip to New Orleans, Louisiana, in 2008. Schneider was strongly opposed to [SG's] sister, [SaG], accompanying him on this trip to New Orleans. Schneider claimed the Apogee Foundation did not have enough money to pay for [SaG] and [SG]. [RG] initially paid for both of her children's round trip tickets and was later reimbursed by Apogee for [SG's] airfare.

---

[15] The Apogee Foundation is Schneider's purported charitable foundation for children gifted in the fine arts.

*Id.* Without any supporting evidence, the Government contends this statement was produced to Schneider's counsel mid-trial, a claim which Schneider disputes.

On September 27, 2010, ten days after RG's second statement and on the fifth day of trial, Schneider's counsel called SG to the stand. On direct, Schneider's counsel elicited from SG information concerning the New Orleans trip. *See* Tr. 5.155 ("Q. Did there come a time when you took a trip to America to perform? A. Yes."); *id.* 5.156 ("Q. Where did you go in America to perform? A. New Orleans."). Counsel specifically asked SG about who paid for the trip and whether his sister, SaG, accompanied him:

> Q. Who paid the expenses for you to go New Orleans and participate in the training program two summers ago?
> A. Mr. Ken.
> Q. Did – Did your sister go with you?
> A. Yes.

*Id.* 5.157. Having had the door opened to details about the New Orleans trip, the Government proceeded to ask SG about it on cross:

> Q. Did you know that your mom didn't want you to go by yourself to the United States?
> A. Yes.
> Q. Did you know that the defendant refused to pay for your sister to come with you to the United States?
> A. Yes.
> Q. And ultimately, did you know that your mom had to pay for your sister to come with you to   the United States?
> A. Yes.

*Id.* 5.160. After the Government concluded, Schneider's counsel declined to conduct any re-direct examination. *See id.* 5.161-62.

Based on the above, Schneider claims his due process rights were violated, and his counsel was ineffective for failing to correct the errors on re-direct. Specifically, he claims (1) the Government knowingly elicited false testimony by suggesting, via leading questions, that

Schneider actively opposed SaG's trip to New Orleans, despite the fact the Report indicates Schneider worked to actively facilitate her joining the trip; and, (2) counsel was ineffective for failing to correct the false record created by the Government. In response, the Government claims it did not elicit false testimony from SG because his testimony was consistent with RG's second statement and aspects of her first statement.

In *Napue v. Illinois*, the Supreme Court held that the government violates a defendant's due process right by knowingly presenting or failing to correct false testimony in a criminal proceeding. *See* 360 U.S. at 269. In this Circuit, a *Napue* violation is established where a § 2255 movant shows: "(1) [the government's witness] committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict." *United States v. John-Baptiste*, 747 F.3d 186, 210 (3d Cir. 2014) (alterations in original and quoting *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004)). "A witness commits perjury if he or she 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).[16]

---

[16] It is not clear, and the parties have not addressed, how the *Napue* standard as interpreted in *John-Baptiste, Hoffecker*, and *Lambert* squares with the Third Circuit's discussion in *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974), where the Third Circuit noted, "We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury." *See also Prosdocimo v. Sec'y, Pa. Dep't of Corr.*, 458 F. App'x 141, 147 n.7 (3d Cir. 2012) (noting that it might be "nonsensical" to require a defendant to establish perjury "in at least some factual circumstances"). Nevertheless, Schneider does not challenge the formulation of his obligations, and so the Court need not address the issue.

Although Schneider has satisfied at least some of the elements for *Napue* relief, he has failed to establish SG committed perjury and thus is not entitled to relief. In the absence of such evidence—which Schneider has not described, much less proffered—there is simply no basis in the record to conclude SG's testimony, as inconsistent as it might have been with what others are reported to have said, was falsely made with "willful intent." *Id.* at 183.[17] As the Third Circuit held in *Lambert*, inconsistencies alone are insufficient to establish perjury for purposes of *Napue* relief. *See* 387 F.3d at 249 ("Discrepancy is not enough to prove perjury. There are many reasons testimony may be inconsistent; perjury is only one possible reason."); *see also Boyd v. United States*, Case No. 13-2587, 2016 WL 8692850, at *3 (D.N.J. Apr. 8, 2016) (denying relief for an ineffective assistance of counsel claim predicated on counsel's failure to move to dismiss the indictment because a witness purportedly offered perjured testimony at trial because "all [petitioner] offers as evidence of perjury are conflicting testimonies from different witnesses").

---

[17] Schneider attaches an affidavit from SG to his motion in which SG recants several material aspects of his trial testimony. *See* Mot. A.20 (noting "there is no way that Ken made my mother pay for my sister's trip or did anything to prevent my sister from joining us on that trip. These are things that I have no doubt about."). SG's revelations aside, the pertinent question is whether SG testified falsely with willful intent, and, on that front, the affidavit is unavailing. At best, it describes SG and RG's poor treatment by the Government, *see* A.19 ("The whole experience [of questioning by the Government and waiting to be called to testify] was very stressful and unpleasant for me.")—but even then, SG does not attest that he intentionally gave the false trial testimony to please the Government or to speed up his return to Moldova, *id.* ("When I took the stand I felt like I was in a trance, beaten up and ready to go home."). Rather, he primarily expresses his regret that his statements were "taken completely the wrong way." A.20; *see also* A.19-20 ("The people in the courtroom directed questions to me in a way that made me have to answer in a certain way. They took my answer out of context."); A.20 ("I have felt guilty for years about my testimony being interpreted the wrong way."); *id.* (noting the Government "got it all wrong. But they got it all right for them. They wanted to twist what I was saying to get Ken convicted."). Accordingly, the affidavit does not support this aspect of Schneider's claim for *Napue* relief.

Based on this absence of evidence, the Court finds Schneider has failed to establish his right to relief under *Napue* and this ground for relief will therefore be denied.[18]

In Claim VII, Schneider claims counsel was ineffective for calling SG as a witness without having interviewed him prior to his testimony. In support of his position, Schneider attaches affidavits from SG and SaG in which they outline the favorable testimony they might have provided. *See* A18-A23. The Government only obliquely responds, opposing relief on the basis that counsels' decision to call SG was a reasonable trial strategy. Opp'n 22. The Court denies relief on other grounds.

Ineffectiveness claims based on counsel's failure to investigate, like this one, call for a sliding scale approach to the reasonableness of counsel's conduct under *Strickland*'s first prong. At one end are "strategic choices made after thorough investigation of law and facts relevant to plausible options," which are "virtually unchallengeable." *United States v. Gray*, 878 F.2d 702, 710 (3d Cir. 1989) (quoting *Strickland*, 466 U.S. at 690)). At the other extreme are those cases in which there is a "complete failure to investigate," in which case, a Sixth Amendment violation is "generally clear." *Id.* at 711. Somewhere in the middle lie "strategic choices made after less than complete investigation," which are protected from second-guessing "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (quoting *Strickland*, 466 U.S. at 690-91); *see also Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996)

---

[18] In his Reply, Schneider claims the Government failed to produce RG's second statement at trial and only learned of the statement's existence after the Government attached it to its Opposition to his § 2255 motion. He insinuates that this failure violated his rights, presumably under *Brady v. Maryland*, 373 U.S. 83, 87 (1964) and *Giglio v. United States*, 405 U.S. 150, 154 (1972). He does not, however, develop the argument beyond averring the "the government is obliged to prove at a hearing that [RG's statement] was shared." Reply 23. His failure to develop this claim is fatal to it. *See Sepulveda v. United States*, 69 F. Supp. 2d 633, 639-40 (D.N.J. 1999) (noting "[i]t is well settled that conclusory allegations are insufficient to entitle a petitioner to relief under §2255" and collecting cases).

("An attorney need not fully investigate every potential avenue if he or she has reasonable grounds for not doing so."). This sliding scale of deference notwithstanding, a movant must still establish prejudice. *See United States v. Travillion*, 759 F.3d 281, 293 n. 23 (3d Cir. 2014) (finding counsel's failure to investigate was a "per se deficiency" but noting the deficiency was "not dispositive," having found the movant "was not prejudiced by the actions of trial counsel.").

Initially, the Court must consider the level of deference to apply to counsels' conduct. On one hand, Schneider insinuates the Court should find counsels' conduct was per se deficient because counsel never interviewed SG, despite the witness's week-long presence in Philadelphia. *See* Mot. 57 ("Not having spoken with SG, trial counsel was not in a position to know what influenced SG, nor how he might express his perceptions of experiences with Petitioner. Thus, when trial counsel called SG, trial counsel was shooting blindly, and paid dearly."). On the other, the Government's argument suggests that, because counsels' decision to call SG accords with counsels' strategy, it is, in *Strickland* parlance, virtually unchallengeable. *See* Opp'n 22 (noting SG's "testimony was part of trial counsel's strategy and cannot be second-guessed").

Having reviewed the pertinent records, the Court finds neither parties' position to be supported. Counsel had clearly done some amount of research into SG's potential testimony—after all, his questioning does track aspects of SG's statements in the Report. Thus, there is no basis to support the conclusion counsel completely failed to investigate how SG might testify and find a "per se" deficiency. *See Travillion*, 759 F.3d at 293 n. 23. On the other hand, the Government's argument that counsel's questioning of SG is outside the bounds of *Strickland* review because it fit within his purported strategy presumes that counsel conducted a thorough investigation of SG's potential testimony—which is the very presumption Schneider challenges. Schneider's counsel was by no means obligated to conduct a comprehensive background check

into SG and his family, but the *end point* of counsel's investigation, where it appears to have been less than exhaustive, *is* subject to review. *See Berryman*, 100 F.3d at 1101 ("An attorney need not fully investigate every potential avenue if he or she has reasonable grounds for not doing so."). Thus, the Court can neither summarily conclude counsels' conduct fell below an objective standard of reasonableness, nor summarily deny relief because counsel's conduct was objectively reasonable.

The Court finds the appropriate inquiry is whether it was reasonable for counsel to have called SG having only reviewed the Report, without having interviewed him or reviewed the email written by the International Center for Women Rights Protection and Promotion attached to it,[19] *see* Opp'n Ex. A at 12-14.[20] In other words, the question is, was counsel obligated to do more than read the Report before calling SG? To answer this question, the Court must consider all the circumstances from counsel's perspective and apply the requisite "heavy measure" of deference. *See Strickland*, 466 U.S. at 691 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment."); *see also Rompilla v. Beard*, 545 U.S 374, 381 (2005) (noting, when "judging the defense's investigation . . . hindsight is discounted by pegging adequacy to counsel's perspective at the investigative decisions are made." (internal quotation marks omitted)).

The Court concludes counsels' decision to call SG having only the Report as a guide to SG's putative testimony was reasonable under the circumstances. Nothing in the Report,

---

[19] This document appears to be an email appended to the Report, but lacks any indication as to when it was sent or by whom.

[20] Because Schneider asserts that RG's second statement was never produced, the Court does not consider it in the mix of information counsel may have discovered had he conducted a more thorough investigation.

considered in isolation, would have compelled further investigation. At worst, SG's statement as recorded in the Report suggests he thought Schneider's touching was "unnecessary." *See* Opp'n Ex. A at 6. However, conspicuously absent from the Report is any mention by SG of any sexual—or *inappropriate*—contact, a fact Schneider's counsel brought out on direct examination. *See* Tr. 5.158:24-25 ("Q. Did Kenneth Schneider ever do anything improper with you? A. No."). Thus, it was reasonable for counsel to call SG to get that fact into the record.

The reasonableness of counsels' decision is further underscored when considered against the backdrop of the events unfolding out of court at that time. SG was called by the defense at the end of the fifth day of trial. At this point, SG and RG had been brought to the United States from Moldova by the Government, housed in a hotel for days at Government expense, questioned by Government lawyers and agents, and then dismissed. *See* Tr. 8.82:8-16.[21] Under those circumstances, it would have been reasonable for counsel to conclude that neither SG nor RG were prepared to provide testimony helpful to the prosecution. Of course (as this case shows), what is unhelpful to the government is not ipso facto helpful for the defense. Nonetheless, considering the context in tandem with the Report, and the "heavy measure" of deference the Court must give to counsels' decision, the Court finds Schneider has failed to satisfy his obligation under *Strickland*'s performance prong and will deny relief. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The

---

[21] Specifically, counsel argued:

> And what you heard is that the Government brought here and stashed him in a hotel with his mother for two weeks and then, send him home without telling anybody. We called and he was on his way to the airport, I had him brought back. The fact that the Government sent him home without calling is a fact – it's a piece of what I'll call circumstantial evidence—it's a circumstance that indirectly suggests something.

Tr. 8.82:8-16.

Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").[22]

In Claim VIII, Schneider asserts the ineffective assistance of counsel in connection with the testimony of his housekeeper, Ludmilla Ivanovna Kozyreva.[23] Specifically, he asserts counsel was ineffective for (1) allowing evidence relating to alleged sexual conduct in Schneider's first apartment in Moscow, *see* Mot. 67; (2) failing to "properly" interview Kozyreva, *see* Mot. 69;[24] and, (3) failing to object to the setting of Kozyreva's testimony as a structural violation of the constitution, *see* Mot. 70.[25] The Court will reject each of these arguments in turn.

First, the Court does not find counsel was constitutionally ineffective for "allowing any evidence relating to alleged illicit sexual conduct that occurred in the first apartment." Mot. 67. This claim flows from Schneider's misinterpretation of the Court's September 3, 2010, evidentiary ruling limiting the Government's ability to introduce "testimonial evidence" of Schneider's sexual

---

[22] The Court will revisit the issue of the prejudice caused by SG's testimony in the context of Claim XIII, in which Schneider seeks relief based on the cumulative prejudice caused by counsels' purported errors.

[23] Kozyreva's name has been spelled in various ways. The Court takes its spelling of her name from the transcript of her video deposition.

[24] Part of this claim rests upon counsel's purported failure to interview Kozyreva's daughter, Olga Kozyreva, who, because of a physical disability, lived with Kozyreva during the relevant time period. The claim is meritless. Even assuming that counsel's performance fell below an objective standard of reasonableness when he failed to interview Olga (which is not clear), Schneider cannot establish prejudice because the contents of her late-discovered testimony would have been largely duplicative of the testimony of her mother and others. *See Jones v. United States*, No. 12-4673, 2014 WL 2114995, at *4 (D.N.J. May 20, 2014) (noting that a petitioner failed to establish prejudice where additional testimony "would have been superfluous and cumulative" and collecting cases for that proposition).

[25] The Government opposes relief on any of these bases, arguing that the questions surrounding the goings-on in the first apartment complied with the Court's evidentiary rulings and that Schneider's constitutional challenge to the setting of Kozyreva's deposition is meritless in light of his own attempt to a witness on his behalf deposed in a similar setting.

misconduct "if such misconduct occurred during the period between August 22, 2000 and November 22, 2001." *See* Mem. & Order, Sept. 3, 2010, ECF No. 95. The same Order also permitted the Government to introduce "evidence regarding the formation of the relationship between Schneider and the victim . . . outside the period from August 22, 2000 to November 22, 2001." *Id.* In his Motion, Schneider claims his counsel was ineffective for allowing Kozyreva to testify that bed linens were found on only one bed in the first apartment Schneider shared with the victim, which the pair vacated in June, 2000. Presumably, this testimony supported the inference that Schneider and the victim shared a bed, which, in turn, supported the inference that Schneider was sexually abusing the victim.

Schneider's claim rests on the faulty premise the September 23, 2010, Order would have prohibited Kozyreva's testimony about the bedding. However, having reviewed the record surrounding the Order, which included the specific statements giving rise to the Order, *see* Gov't's Response to Court's Order of Aug. 19, 2019, Aug. 24, 2010, ECF No. 91, it is clear the "testimonial evidence" to which the Court's Order refers is the victim's graphic recounting to the FBI of the manner and method of Schneider's sexual abuse. After conducting the requisite balancing, the Court concluded that, although the descriptions were clearly probative, the statements' graphic details risked unfair prejudice. The Court thus limited the admissibility to statements describing the abuse during a certain time period. *See* Mem. & Order, Sept. 3, 2010, ECF No. 95. It is not at all clear, and Schneider has not explained, how the Court's narrow ruling could have been construed to prohibit Kozyreva's testimony concerning the bedding. And, because counsel cannot be ineffective for failing to raise an otherwise meritless objection, no relief is due. *See Werts v.*

*Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) (noting "counsel cannot be deemed ineffective for failing to raise a meritless claim.").[26]

Second, Schneider claims counsel was ineffective for failing to adequately interview Kozyreva. The thrust of Schneider's claim appears to be that, had counsel conducted a "proper" interview of Kozyreva, he would have discovered certain "relevant and extremely helpful" information, which is contained in an affidavit signed by Kozyreva and attached to his Motion. Mot. 68; *see also* A25-28. Relief will be denied because this claim engenders the sort of hindsight bias that *Strickland* and its progeny unambiguously proscribe. *See Yarborough*, 540 U.S. at 6 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").

The evidence in the record reflects that Schneider's representatives—including his American and Russian counsel, a translator, and Tatiana Dokukina—met with Kozyreva on *several* occasions prior to her testimony. *See* Tr. (LK) 39:22-40:7 (confirming American and Russian counsel, and a translator, visited Kozyreva at her apartment, and that Russian counsel had, on at least one prior occasion, also interviewed her); *see also id.* 36:4-7 ("Q. And Tatiana [Dokukina] did, in fact, come to visit you? A. Well, she probably lives here in Moscow. *Yes, she came.*" (emphasis added)). It is not clear—and Schneider has not explained—how the answers Kozyreva gave in the first *three* meetings (one with Dokokina, one with Russian counsel, and one with both Russian and American counsel) justified a fourth, *see Berryman*, 100 F.3d at 1101 ("An attorney need not fully investigate every potential avenue if he or she has reasonable grounds for not doing so."), and the Court will not second-guess the specific questions counsel asked of

---

[26] The Court denies relief on the *Strickland* performance prong but would also deny relief because Schneider has not met his burden under *Strickland*'s prejudice prong.

Kozyreva, *see Strickland*, 466 U.S. 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after is has proved unsuccessful, to conclude that particular act or omission of counsel was unreasonable."). As a result, this aspect of Schneider's motion will be denied.

Third, Schneider claims trial counsel was constitutionally ineffective for "failing to move to strike the Kozyreva testimony as a structural violation of the United States Constitution" and appellate counsel was ineffective for failing to raise the issue on direct appeal (to whatever extent it had been preserved).[27] Mot. 70-71. Schneider has not supported his assertion with authority supporting his position and his claim will be denied. While it is true that both Kozyreva and her daughter's affidavits suggest a fear of Russian law enforcement, Schneider was obligated to cite relevant authority—or make an argument for the extension of extant relevant authority, if none could be found—that such a fear constitutes a structural error resulting in a violation of his constitutional rights. *See Sepulveda v*, 69 F. Supp. 2d at 639-40 (noting "[i]t is well settled that conclusory allegations are insufficient to entitle a petitioner to relief under §2255" and collecting cases). He failed to do so. As a result, the Court will deny relief because counsel cannot be constitutionally ineffective for failing to make an objection or assert a basis on appeal which lacks any basis in law. *See Werts*, 228 F.3d at 203 (noting "counsel cannot be deemed ineffective for failing to raise a meritless claim.").

In Claim IX, Schneider asserts counsel was ineffective for failing to arrange the testimony of Tatiana Ponomorova, a Russian citizen who tutored Schneider in the Russian language and occasionally provided translation services to him in the course of his business. Schneider claims

---

[27] Structural errors are discussed in greater detail below.

Ponomorova would have testified to his efforts to secure housing for the victim outside his own apartment—thus negating the government's theory that "a man in his early thirties who insists that a twelve-year-old boy live alone with him is just the type of man who would molest such a boy." Mot. 72. The government opposes relief on the basis Schneider cannot show prejudice. The Court agrees with the government.

At issue here is whether counsel's failure to secure Ponomorova's testimony about Schneider's alleged request that she house the victim and his inquiry into her awareness of possible alternative placements when she said that she could not house the boy, was so deficient that, but for counsel's failure, "there is a reasonable probability . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Court concludes counsels' failure does not create such a probability. As the Government points out, Schneider himself testified as to his efforts to secure alternative housing for the victim. *See* Tr. 7.112:10-14 ("Q. What steps did you take to find housing for [RZ] in that neighborhood? A. I contacted everyone I knew in the neighborhood to see whether they could host him or who knew someone who could, for example."). When asked whether he could recalled any "specific conversations," Schneider testified as having specifically asked Ponomorova and the housekeeper, Kozyrema, whether either of them could house the boy. *See* Tr. 7.112:15-22.[28]

The issue was also presented earlier in the trial through the testimony of Tatiana Dokukina. During her cross-examination, counsel broached the subject of Schneider's attempts to secure alternate housing. In response to counsel's questions, Dokukina confirmed (1) she had had

---

[28] Schneider testified: "Well, I asked my Russian teacher immediately, 'cause I was seeing her regularly and she lived in the area. I also asked my housekeeper whether my housekeeper could put him up in – in her apartment." Tr. 1.112:19-22.

conversations about the victim's housing with Schneider, *see* Tr. 4.63:21-25; (2) she was aware the Bolshoi's administrators had, at least according to the victim's parents, forbidden him from living in the dormitory, *see* Tr. 4.65:7-11; and (3) her belief there were two options for the victim's living situation: "for him to live separately and hire some kind of a governess" and "to put [the victim] at Ken's and then his housekeeper would be taking care of him," Tr. 4.65:13-19. Although this testimony is, perhaps, not as affirmatively supportive of Schneider's version of events as the Government suggests, Dokukina's answers clearly support the inference Schneider's counsel asked the jury to make—that Schneider did not engineer the victim's living situation such that the victim had no choice but to reside with Schneider. *See* Tr. 8.101 ("Counsel keeps saying and witnesses have been encouraged to say that [RZ] went back to the dormitory and then, Ken got him out of the dormitory and took him in to his apartment. That's not true. How do you know it's not true? There's no order readmitting him to the dormitory.").

Because the justification for Schneider's housing the victim was properly raised by Schneider himself, discussed by Tatiana Dokukina during her cross-examination by Schneider's counsel, and at least indirectly referred to by counsel during his closing, it is not clear what more Ponomorova's putative testimony would have added to the mix. *See Hess v. Mazurkiewicz*, 135 F.3d 905, 909 (3d Cir. 1998) (noting § 2254 petitioner failed to establish *Strickland* prejudice based on counsel's failure to call additional alibi witnesses where the alibi defense was presented by witnesses who testified). Accordingly, Schneider has failed to establish the missing testimony undermined confidence in the outcome of his trial. *See Strickland*, 466 U.S. at 694. Relief will be denied on this ground.

Claim X stems from the victim's purported perjury and trial and appellate counsels' purported failure to accurately present it to this Court and the Third Circuit.[29] Specifically, Schneider asserts a series of notes prepared by the victim's therapist reveal the victim's fear he committed perjury during the criminal trial. On this basis, Schneider moved for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). The Court denied the motion without an evidentiary hearing and the Third Circuit subsequently affirmed. *See* Order, Feb. 15, 2013, ECF No. 262; *see also Schneider*, 801 F.3d at 203-04. Now, in Claim X of the instant motion, Schneider asserts his trial and appellate counsel were ineffective in presenting the issue before both tribunals by failing to accurately reconstruct the timeline surrounding the notes. If counsel had been effective, Schneider alleges, they would have shown the recantation to which the victim alluded could only have referred to his criminal testimony, and thus would likely have obtained at least an evidentiary hearing on the treatment notes, if not, ultimately, a new trial.

Schneider has not shown a right to relief. It is not clear, and Schneider has failed to identify with any precision, what aspects of counsels' presentation to this Court or the Third Circuit were deficient. Schneider cites no specific portion of trial or appellate counsels' briefing, or the transcript of the argument before this Court or the Third Circuit, and the Court is not obligated to mine the voluminous record on his behalf. Thus, Schneider has failed to establish that counsels'

---

[29] A federal criminal defendant has the right to the effective assistance of appellate counsel as a matter of due process under the Fifth Amendment. *See United States v. Cross*, 308 F.3d 308, 315 n. 11 (3d Cir. 2002) (noting "the Fifth Amendment's Due Process Clause guarantees federal-court defendants" a "right to effective assistance of appellate counsel"). The source of the right notwithstanding, the standard for evaluating appellate counsel's conduct is the one set in *Strickland*, which discussed the right to counsel under the Sixth Amendment. *See Smith v. Robbins*, 528 U.S. 259, 285-286 (2000) (noting "the proper standard for evaluating [petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984)); *see also Cross*, 308 F.3d 315 n. 12 ("Although *Strickland* relied on the Sixth Amendment, which does not apply to appellate proceedings, it is well-settled that its framework governs claims of ineffective assistance of appellate counsel." (internal quotation marks and citations omitted)).

conduct fell below an objective standard of reasonableness. *See United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000) (noting "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court"); *see also Cross*, 308 F.3d at 315 (noting a § 2255 movant must show appellate counsel's representation fell below *Strickland*'s "objective standard of reasonableness" to obtain relief).

More problematic, the Court is not persuaded Schneider can show prejudice with respect to counsels' performance, i.e., that either this Court would have granted his motion for a new trial or the Third Circuit reversed this Court's denial of his motion for a new trial, had counsel performed in the way Schneider claims they should have.[30] The Court rejects Schneider's argument for two reasons. First, he has not accounted for the portion of the treatment note which expressly situates the victim's fear of a perjury prosecution in the context of his civil case against the Schneiders. *See* A.36 (noting "client explained that his atty has advised that if he admits to lying under oath *in the civil case* he faces up to 10 years in prison." (emphasis supplied)). And second, having considered more than the out-of-context sentence from which Schneider now extrapolates, the Court sees no reason to disturb its—and the Third Circuit's—earlier conclusions that the notes are inculpatory.[31] *See Schneider*, 801 F.3d 203-204 (noting "the psychologists notes are also strongly corroborative of the victim's testimony at trial."); *United States v. Schneider*, No. 10-29, 2013 WL 592148, at *4 (E.D. Pa. Feb. 15, 2013) (noting "the [psychologist's] notes make

---

[30] To show prejudice for an ineffective advice of appellate counsel claim, a movant must show that there is a reasonable probability "that his appeal would have prevailed had counsel's performance satisfied constitutional requirements." *Cross*, 308 F.3d at 315 (citing *Strickland*, 466 U.S. at 694-95); *see also United States v. Mannino*, 212 F.3d 835, 844 (3d Cir. 2000) ("The test for prejudice under *Strickland* is not whether petitioners would likely prevail upon remand, but whether we would have likely reversed and ordered a remand had the issue been raised on direct appeal.").

[31] The psychologist reports the victim describing his "abuser," i.e., Schneider, as taking "care of his needs financially and emotionally and professionally." A36.

clear that [the victim's] reports of Schneider's sexual abuse remain consistent and uncontradicted" and the "only materiality the notes have weights in favor of Schneider's guilt"). As a result, the Court will deny this claim on *Strickland*'s performance and prejudice prongs.

In Claim XI, Schneider asserts counsel was ineffective in connection with certain evidence located abroad. Specifically, Schneider claims counsel was ineffective for failing to move to dismiss the indictment on the basis of a structural error after it became clear the defense would have to proceed without the testimony of Yuri Palchikov, the Bolshoi Academy's former vice-rector, and the victim's medical records from Bolshoi doctors created during the period of the alleged abuse. The Court will deny relief because its inability to secure Palchikov's testimony or the victim's records was not a structural error, thus a motion by defense counsel suggesting the contrary would have been meritless, and the failure to make a meritless motion cannot serve as the basis for § 2255 relief.

There are two types of constitutional errors for which relief may be granted: "'trial errors,' which are subject to constitutional harmless error analysis, and 'structural defects,' which require automatic reversal or vacatur." *Palmer v. Hendricks*, 592 F.3d 386, 397 (quoting *United States v. Stevens*, 223 F.3d 239, 244 (3d Cir. 2000)). "Structural defects are 'defects in the constitution of the trial mechanism' that affect 'the framework within which the trial proceeds,' with such a resulting impairment in the trial's function of determining guilt or innocence that 'no criminal punishment may be regarded as fundamentally fair.'" *United States v. Vazquez*, 271 F.3d 93, 103 (3d Cir. 2001) (quoting *Arizona v. v. Fulminante*, 499 U.S. 279, 309-10 (1991) (opinion of Rehnquist, C.J.)). The Supreme Court has recognized structural errors "only in a very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (collecting cases). The list "includes complete denial of counsel, biased judges, racial discrimination in selection of grand

jury, denial of self-representation at trial, denial of public trial, and a seriously defective reasonable doubt instruction." *Palmer*, 223 F.3d at 397 (quoting *Stevens*, 223 F.3d at 244)).

Schneider claims the Court's inability to compel Palchikov to testify or obtain the medical records from the victim's time at the Bolshoi Academy were structural errors because the Government was able to make use of the United States' Mutual Legal Assistance Treaty with Russia to secure evidence in its favor, and he was not. Schneider asserts "a defendant's rights to a fair trial, due process and compulsory process do not permit the government to have a greater ability [to] obtain necessary trial evidence through compulsory process than a defendant." Mot. 79. Schneider does not, however, cite any legal authority in support of his position (as intuitive as parity in access to evidence may sound in the abstract) and the Court finds none, having conducted its own research. For this reason, the Court will decline Schneider's invitation to find the asymmetrical access to information resulted in a structural error requiring vacatur of his conviction, which has the cascading effect of foreclosing Schneider's claim that counsel was ineffective for failing to move to dismiss the indictment on this basis. *See Werts*, 228 F.3d at 203 (noting "counsel cannot be deemed ineffective for failing to raise a meritless claim").

The Court's conclusion accords with decisions from other courts recognizing limitations on the right to compulsory process in the context of evidence located abroad. *See United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990) (noting "the right of compulsory process does not ordinarily extend beyond the boundaries of the United States"). These out-of-circuit cases suggest a criminal defendant's right to compulsory process in this context is co-extensive with the *Court's authority* to command a subject's participation, as distinct from the *Executive's* ability to secure such evidence through its own agreements with other countries. *See United States v. Rosen*, 240 F.R.D. 204, 214 (E.D. Va. 2007) (noting "it is quite clear that the right to compulsory process

extends only to forms of process a court can issue of its own power, not to forms of process that require the cooperation of the Executive Branch or foreign courts."); *see also United States v. Sedaghaty*, 728 F.3d 885, 917 (9th Cir. 2013) (holding the district court "had no authority to order the Executive Branch to invoke the treaty process to obtain evidence abroad for a private citizen").[32] Because *the Court* had no power to compel Palchikov to testify or the Bolshoi to produce the records, the Court cannot have committed a structural error by failing to somehow make those items available for Schneider's defense, and, therefore, counsel could not have been ineffective for raising this otherwise meritless issue. Relief will be denied on Claim XI.[33]

---

[32] The MLATs at issue in *Rosen* and *Sedaghaty* (which cites *Rosen*) were between the United States and Israel and the United States and Egypt, respectively. However, both contain substantially similar operative language to the one between the United States and Russian Federation at-issue in this case. *Compare* Treaty with Russia on Mutual Legal Assistance in Criminal Matters, art. 1 ¶ 4, June 17, 1999, T.I.A.S. 13,046 ("This treaty is intended solely for cooperation and legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any other persons to obtain evidence, to have evidence excluded, or to impede the execution of a request."); *with* Treaty with Israel on Mutual Legal Assistance in Criminal Matters, art. 1 ¶ 4, Jan. 26, 1998, T.I.A.S. 12925 ("This Treaty is intended solely for the mutual assistance between the Parties. The provisions of this Treaty shall not give rise to any right, that does not otherwise exist, on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."), *and* Treaty Between the Government of the United States of America and the Government of the Arab Republic of Egypt on Mutual Legal Assistance in Criminal Matters, art. 1 ¶ 4, May 3, 1998, T.I.A.S. 12,948 ("This treaty is intended solely for mutual legal assistance between the Contracting Parties. The provisions of this Treaty shall not give rise to a right on the party of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.").

[33] For the first time in his Reply, Schneider raises the issue of counsel's ineffectiveness in connection with failing to seek Letters Rogatory for Palchikov's testimony and the victim's medical records. *See* Reply 35. The Court will not grant relief on this basis, its tardiness aside. Schneider conceded in the first paragraph of Claim XI that "Letters Rogatory issued by a federal district court judge to a Russian court would not be honored." Mot. 78. On the basis of this concession, the Court concludes it was reasonable for his counsel to determine that attempting to obtain them would be a waste of time (this Court's invitation notwithstanding), especially considering there were only 11 days between the time of the Court's order refusing to direct the Government to use its MLAT authority and the start of trial. *See* Order, Sept. 9 2010, ECF No. 97. Nor, is it clear that Schneider was prejudiced by counsels' failure. After all, if the result would have been the same whether or not counsel had obtained the formal Letters Rogatory—i.e., no Russian court would honor them—it would be impossible for Schneider to show that production

In Claim XII, Schneider asserts appellate counsel was constitutionally ineffective in connection with his statute of limitations defense. Before this Court and the Third Circuit, Schneider argued his conviction was barred by the five-year statute of limitations generally applicable to federal crimes.[34] *See* 18 U.S.C. § 3282 (setting a statute of limitations of five years for "any offense, not capital"). Counsel advanced what the Third Circuit described as an "essential ingredient" test, asserting that because sexual abuse is not an "essential ingredient" of the crime of Schneider's conviction (violation of 28 U.S.C. § 2423(b)), the charge was subject to § 3282's shorter limitations period, and not the longer period established by 18 U.S.C. § 3283 (2003), which, at the time, permitted prosecution "for an offense involving the sexual . . . abuse of a child" at any time prior to the victim's 25th birthday. The Third Circuit rejected this argument, noting Schneider's conduct satisfied the definition of "sexual abuse," and thus warranted the application of the longer statute of limitations set by § 3283.[35]

On collateral review, Schneider argues that counsel was constitutionally deficient by advancing the essential ingredient test. Instead, Schneider now claims, counsel should have argued for a categorical approach—i.e., one considering only the elements of the offense charged, without respect to his particular offense conduct. He also challenges § 3283's use of the term "sexual abuse" as vague, and subject to attack in the same manner as the residual clause of the Armed Career Criminal Act. *See Johnson v. United States*, 135 S.Ct. 2551, 2557 (2015) ("We are

---

of the Letters would have created the reasonable probability of a different outcome at trial. As a result, Schneider has not stated a claim for relief under *Strickland*.

[34] Schneider was charged in 2010 with criminal conduct which took place in 2001.

[35] "Sexual abuse" is defined to include, "the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, sexually explicit conduct, or the rape, molestation, prostitution, or other form of sexual exploitation of children." 18 U.S.C. § 3509(a)(8) (2000).

convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause denies fair notice to defendants and invites arbitrary enforcement by judges."). The Court need not actually engage with the merits of Schneider's arguments because he has made no discernible effort to show that counsels' decisions to make the essential ingredient argument and leave out the vagueness challenge were objectively unreasonable. Surely, counsel *could* have made the arguments Schneider now advances with the benefit of hindsight, but he has not shown counsel *should* have made those arguments to satisfy constitutional minimums (to say nothing of showing that, had counsel made these arguments, the appellate court was reasonably likely to remand the matter). *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.") The Court thus finds Schneider is not entitled to relief on Claim XII.

Finally, in Claim XIII, Schneider asserts his counsels' cumulative errors justify § 2255 relief.[36] Third Circuit precedent recognizes "that errors that individually do not warrant a new trial may do so when combined." *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 1993)). "Essentially, [a § 2255 movant] must demonstrate that the errors in combination would be sufficient to show *Strickland* prejudice." *Judge v. United States*, 119 F. Supp. 3d 270, 292 (D.N.J. 2015) (citing *Albrecht*, 485 F.3d at 139).

---

[36] In his Motion, Schneider argues that the *Napue* violation should also be considered in the mix, but, having determined that there was no *Napue* violation, the Court does not consider it.

Schneider is not entitled to relief. At the outset, the Court's consideration of cumulative prejudice is limited to only those items which may have caused prejudice notwithstanding the Court's determination that *Strickland* relief was not warranted because counsel's conduct in connection with those items was reasonable. Of the numerous grounds for relief discussed above, the Court discerns only three which fall into this category: counsels' decision to call E. William Hevenor, Christina Bates, and SG. Although the strategy for calling these individuals was clear enough, no person who sat through the trial or reviewed the transcript could deny that aspects of these individuals' testimony were unhelpful to Schneider's cause.[37] Nevertheless, when balanced against the inculpatory testimony of the victim—which the Court and jury found highly persuasive—the Court is not convinced that, had Hevenor, Bates, and SG not testified, there is a reasonable probability the verdict would have been any different. As a result, the Court finds the cumulative prejudice caused by calling these specific witnesses does not justify the relief Schneider seeks, and will deny relief on Claim XIII.

The final issue the Court must address is whether Schneider is entitled to a certificate of appealability, which is required by 28 U.S.C. § 2253(c)(1) as a precondition to his right to seek review of this decision by the Third Circuit. A certificate may only issue where a movant makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which, after a determination of the merits of a § 2255 motion, requires a showing "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v.*

---

[37] This is particularly true in the case of SG's testimony during cross-examination, in which he agreed that Schneider ran "his hand up and down" SG's back during yoga lessons, which made him "a little bit" "uncomfortable." *See* Tr. 5.160-61 ("Q. And didn't he put his hands on you while he was giving you yoga lessons? A. Yes. Q. Did he run his hand up and down your back and tell you, he was checking your spine? A. Yes. Q. And did he put his hands on your shoulders and tell you he was aligning your shoulders? A. Yes. Q. And that made you uncomfortable, didn't it? A. A little bit, it did.").

*McDaniel*, 529 U.S. 473, 484 (2000). Schneider has failed to make a substantial showing of the denial of a constitutional right, and the Court finds it unlikely reasonable jurists would disagree with its determination of the merits of his motion. Consequently, the Court will not issue a certificate of appealability.

**CONCLUSION**

For the reasons stated above, the Court will deny Schneider's § 2255 motion in its entirety without an evidentiary hearing and will not issue a certificate of appealability.

An appropriate order follows.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.